# Exhibit A

# ℝ𝕄 Financial Services

## FINANCING AND SECURITY AGREEMENT ("AGREEMENT")

**DATED AS OF** 15 December 2021

**PARTIES** subject to this Agreement are as follows:

A. Jean Guikas of 5, Avenue Lavoisier, Carnoux-en-Provence, 13470, FR and his respective affiliates, successors, or designates ("**Guikas**");

B. GTC SASU of 5, Avenue Lavoisier, Carnoux-en-Provence, 13470, FR and its respective affiliates, successors, or designates ("**GTC**");

(Guikas and GTC collectively, the "**Borrower**")

C. RM Auctions, Inc. d.b.a. RM Sotheby's of 5536 County Road 11A, Auburn, IN 46706 and any affiliated, executors, beneficiaries, successors, assigns, or designated companies ("**RMS**"); and

D. RM Financial Services LLC of 5536 County Road 11A, Auburn, IN 46706 and any affiliated, executors, beneficiaries, successors, assigns, or designated companies ("**RMFS**").

("**Party**", together "**Parties**")

**WHEREAS:**

A. This Agreement is drafted to address a number of transactions that have occurred since March 2021 between the Parties; this Agreement will consolidate the transactions into one Agreement moving forward.

B. In March 2021, the Parties entered into an Advance Addendum to the 2021 RM Sotheby's Guikas Collection Auction Consignment Agreement ("**Advance Addendum**") wherein, RMFS provided an advance of 18,000,000 EUR ("**Advance**") to the Borrower in consideration for the Borrower pledging the consigned auction cars as security.

C. In August 2021, as outlined in the Second Advance Addendum to the 2021 RM Sotheby's Guikas Collection Auction Consignment Agreement ("**Second Advance Addendum**"), GTC subsequently agreed to purchase from RMS a 1970 Ferrari 512M 'Sunoco', VIN: 1040 ("**1040**"); 1960 Ferrari 250 GT LWB California Spyder, VIN: 1715GT ("**1715GT**"); and 1973 Ferrari 365 GTB/4 Daytona Competizione, VIN: 16367 ("**16367**") for a total purchase price of 29,600,000 EUR.

D. As of the date of this Agreement, the Borrower wishes to (i) repay RMFS the Advance using the proceeds of sale from the recent Guikas Collection auction (the "**Proceeds**") and (ii) obtain financing from RMFS in the amount of 23,400,000 EUR, based on the Collateral (defined below), subject to and conditioned upon fulfillment of each of the Financing Contingencies as outlined and defined in the Conditions of Business (defined below) ("**Financing**"). To be clear, RMFS is not sending the Financing to the Borrower but rather, the Financing is credited towards the Borrower's outstanding account that would have otherwise been due to RMFS.

**IN CONSIDERATION** of the respective covenants and agreements contained in this Agreement including, the preamble above which is incorporated below, in its entirety and, for other good and valuable consideration (the receipt and sufficiency of which are mutually acknowledged), the Parties covenant and agree as follows:

1. **Collateral Description(s):** The Collateral described in this Agreement are a (i) 1972 Ferrari 312 PB, Chassis No.: 0886 (the "**312 PB**"); (ii) Alfa Romeo 2500 SS 256, Chassis No.: 915026 (the "**Alfa Romeo**"); (iii) ISO/A3C, Chassis No.: B0204 (the "**ISO/A3C**"); (iv) Williams F1 W14 (the "**Williams**"); and (v) 1972 Matra 670, Chassis No.: 02 (the "**Matra**") (collectively, with all their parts, accessories, and documentation that are owned by or in the possession or control of the Borrower or the Borrower's current lender, or which later come into the Borrower's ownership, possession or control, "**Collateral**").

2. **Origination Fee:** RMFS' standard origination fee will be waived ("**Origination Fee**").

3. **Financing Distribution:**

   3.1. In lieu of cash payment, RMS will exchange possession of the 1715GT and 1040 with the Borrower for possession of the 312 PB to cover the Financing on January 7, 2022 and an invoice will be issued on that date, and both cars will immediately be released/available for delivery.



    3.2. Prior to the Repayment Date (defined below) and while the Financing is outstanding, the Borrower will work exclusively with RMS to sell the 312 PB via private sale for an asking price of 25,000,000 EUR and, will guarantee 23,400,000 EUR of the 312 PB sale proceeds *plus* any applicable Interest (defined below) and Expenses (as incurred) (defined below) to RMFS ("**312 PB Guarantee**")

        3.2.1. If (i) there is a shortfall or (ii) the 312 PB is not sold prior to the Repayment Date, the Borrower agrees to consign and sell the remaining Collateral as outlined in clause 6 below until the Financing, applicable Interest, and applicable Expenses (as incurred) are repaid to RMFS ("**Repayment**").

4. **Interest:**

    4.1. Beginning 20 December 2021, Interest on the Financing shall accrue at an annualized rate equal to 6.0% for up to 6 months.

    4.2. If full Repayment has not been made on the Financing by June 20, 2022, any existing Financing amount will accrue Interest at a rate equal to the U.S. Prime Rate as published daily in the Wall Street Journal (currently 3.25%) + 2.75% compounded daily per annum in accordance with the terms of the Conditions of Business.

    4.3. GTC will pay by wire transfer to RMFS 350,000 EUR as payment towards the Interest no later than January 7, 2022. If full Repayment is made prior to 31 March 2022, RMFS will refund to GTC any excess Interest owed within 3 business days of receiving full Repayment. If Repayment is not made by 31 March 2022, GTC will pay by wire transfer to RMFS a second payment of 350,000 EUR as interest for Q2 2022 no later than 7 April 2022 and likewise will be refunded any excess amount if full Repayment is made in Q2 2022. If Repayment is not made by 30 June 2022, GTC will pay by wire transfer to RMFS a third payment of 350,000 EUR as interest for Q3 2022 no later than 7 July 2022 and likewise will be refunded any excess amount if full Repayment is made in Q3 2022.

    4.4. Any Interest owed to RMFS above 1,050,000 EUR must be paid to RMFS in full by the Repayment Date.

    (clauses 4.1 to 4.3 collectively, the "**Interest**")

5. **Repayment:**

    5.1. The repayment date shall be no later than 12 months from 20 December 2021 (i.e., 20 December 2022) (the "**Repayment Date**")

    5.2. Specifically, the Borrower will be required to pay RMS 6,200,000 EUR by no later than 7 January 2022 as payment for the 16367. Upon RMFS receiving payment of 6,200,000 EUR, ownership of the 16367 will transfer to GTC with an invoice supplied on the date of payment and the 16367 will be made available for delivery.

        5.2.1. If RMS does not receive the payment of 6,200,000 EUR on or before 7 January 2022, the 16367 will be added to the Collateral, RMS will maintain possession until payment is received and 6,200,000 EUR will be added to the amount of the Financing starting 8 January 2022.

    5.3. If (i) there is a shortfall or (ii) the 312 PB is not sold prior to the Repayment Date, the remainder of the Financing shall be repaid using the proceeds from the sale of the Collateral as outlined in clause 6 below.

6. **Private Sale of Collateral:**

    6.1. If 312 PB sells for a net price that is below the Financing amount owed at the time of the sale, the Borrower will have the option to either (i) make complete Repayment to RMFS or (ii) jointly market with RMS the following Collateral for private sale:

        6.1.1. Alfa Romeo for an asking price of 8,000,000 EUR; and/or

        6.1.2. ISO/A3C for an asking price of 4,000,000 EUR; and/or

        6.1.3. Williams for an asking price of 2,000,000 EUR.



PS-19-00043

6.2. If either the 312 PB, Alfa Romeo, ISO/A3C, or Williams are sold by RMS to a RMS client at a price that is accepted by the Borrower, RMS will earn a Seller's Commission of 4%. If either the 312 PB, Alfa Romeo, ISO/A3C, or Williams are sold by the Borrower to one of their clients, RMS will earn a Seller's Commission of 2%.

    6.2.1. Any RMS earned Seller's Commission will be added to the amount of the Financing at the time of Repayment.

6.3. If the sale of the 312 PB, Alfa Romeo, ISO/A3C, and/or Williams does not cover the Repayment, this will be considered a Termination Event as outlined and defined in clause 4 of the Conditions of Business.

7. **Prepayment:** At any time, the Borrower may pay either part or all of the Financing, applicable Interest, and Expenses (as incurred) with no prepayment penalty.

8. **Insurance:**

    8.1. The Borrower will be required to maintain sufficient insurance on the Collateral that remains in their possession until Repayment is made to RMFS. As further outlined in the Conditions of Business, the Borrower will be required to provide RMFS with a certificate of insurance listing RMFS as a primary loss payee with priority before all other payees for the amount of the Financing.

    8.2. If it is required that any Collateral be stored at a RMFS storage facility or SRO's storage facility at the Paul Ricard circuit in Le Castellet, France, RMFS will maintain insurance on this Collateral and any insurance costs will be evenly split (50:50) between RMFS and the Borrower.

9. **Possession of Collateral:** The Collateral will be stored in the possession of the Borrower, however, RMFS has the right to take immediate possession of the Collateral if the Borrower is late on an Interest payment and does not cure the late payment within 3 business days, or fails to make full Repayment by the Repayment Date. The Borrower will be responsible for any transportation and storage costs associated with the Collateral ("**Transportation and Storage Expenses**"). To be clear, and as further outlined in the Conditions of Business, Transportation and Storage Expenses will be considered a part of the defined term "Expenses".

10. **Personal Guarantee:** Guikas personally guarantees the obligations of GTC under this Agreement. Further details are outlined in the Personal Guarantee attached as Attachment "B" to this Agreement which Guikas is required to sign and agree to as a condition of this Agreement.

(Clause 1 through 10 together "**Specific Information**")

11. **Overriding Clause:** If there is a conflict between the Specific Information and the Conditions of Business, Advance Addendum, Second Advance Addendum, Attachment(s), and Continuing Power of Attorney (Attachment "A"), the Specific Information will override.

12. **Specific Information:** To be clear, the defined term "Specific Information" is meant to clarify the terms and conditions of this Agreement that are varied from the enclosed Financing and Security Agreement Conditions of Business ("**Conditions of Business**") which together form the contractual basis of this Agreement.

**SIGNATURES:** The Parties acknowledge and agree to be bound by this Agreement which includes all the Specific Information outlined, Conditions of Business, Advance Addendum, Second Advance Addendum, Attachment(s), and Continuing Power of Attorney (Attachment "A") contained within the multiple pages of this Agreement.

[SIGNATURE PAGE TO FOLLOW]



PS-19-00043

JEAN GUIKAS,
in his individual capacity:

By: Jean Guikas
Title:
Date: 11/12/21

GTC SASU:

By: Jean Guikas
Title: President
Date: 11/11/21

```
――――GTC――――
5, avenue Lavoisier
13470 Carnoux-en-Provence
        FRANCE
Tél. 04 42 72 61 99
RCS Marseille B 349 432 930
www.guikasgtc.com
```

RM FINANCIAL SERVICES LLC:

By: [signature]
Title: SVP RMFS
Date: 12/16/2021

RM AUCTIONS, INC. d.b.a. RM SOTHEBY'S:

By: [signature]
Title: SVP RMFS and Private Sales
Date: 12/16/2021

## FINANCING AND SECURITY AGREEMENT CONDITIONS OF BUSINESS

1. **Economic and Fee Structure:**
   1.1. *Financing.* Subject to and conditioned upon fulfillment of each of the Financing Contingencies outlined in clause 2 below, (i) RMFS will grant or continue to grant the Financing; OR (ii) within 5 business days, RMFS will deliver the Financing to the Borrower by wire or ACH transfer pursuant to instructions to be provided by the Borrower.
   1.2. *Interest:* If applicable, Interest will be charged to the Borrower on the Financing and applicable Expenses (as defined in the Definitions section at the end of these Conditions of Business) (as incurred) from either (i) the date RMFS grants the Financing OR (ii) the date RMFS transfers the Financing to the Borrower until the end of the Term.
      1.2.1. If applicable, the variable Interest on the Financing and applicable Expenses (as incurred) is calculated based on the U.S Prime Rate then in effect, as published by The Wall Street Journal ("**U.S. Prime Rate**"). The Borrower acknowledges that Interest will be adjusted daily to account for changes in the U.S. Prime Rate and may increase or decrease during the Term of this Agreement.
      1.2.2. If the Borrower misses an Interest payment, the Borrower will have 15 business days to pay RMFS the Interest payment.
         1.2.2.1. After 15 business days, if the Borrower does not pay RMFS the Interest payment ("**Missed Interest Payment**"), this will be considered a Termination Event(s) (defined below).
      1.2.3. If there is a Default (defined below), the Interest rate will increase to the Default Interest (defined below) rate and, will continue to be charged at the rate defined below for circumstances of Default.
      1.2.4. If there is a Deficiency (defined below), the Interest rate will increase to the Deficiency Interest (defined below) rate and, will continue to be charged at the rate defined below for circumstances of Deficiency.
   1.3. *Insurance:*
      1.3.1. If the Collateral is added to RMFS' Inventory Insurance Policy at the Insured Value (as outlined in the Specific Information of this Agreement), (i) RMFS will provide the Borrower with a certificate of insurance listing the Borrower as a loss payee for the amount of the Financing, AND (ii) any and all Insurance Expenses will be added to the amount to be repaid with the Financing under this Agreement.
      1.3.2. If the Borrower is required to maintain insurance on the Collateral at the Insured Value (as outlined in the Specific Information of this Agreement), the Borrower agrees to (i) insure the Collateral during the Term; AND (ii) provide RMFS with a certificate of insurance listing RMFS as a primary loss payee with priority before all other payees for the amount of the Financing.
         1.3.2.1. If there is an insurable loss and, there is a deductible, the Borrower will be responsible to pay the full amount of the deductible.
   1.4. *Origination Fee.* The Origination Fee will be added to the amount to be repaid with the Financing under this Agreement.

2. **Financing Contingencies:** The Financing is contingent upon the following:
   2.1. RMFS receiving the completed Financing Application Checklist and corresponding documents;
   2.2. RMFS receiving the original fully executed version of this Agreement.
   2.3. The Borrower signing a new agreement if an extension is requested;
   2.4. The Borrower providing RMFS with a good, clear, and transferable Title to the Collateral;
   2.5. RMFS possessing the original Title to the Collateral;
   2.6. If applicable, the Borrower providing RMFS with the Down Payment within 5 business days of signing this Agreement;
   2.7. If applicable, the Borrower providing RMFS with a certificate of insurance listing RMFS as a loss payee for the amount of the Financing;
   2.8. Confirmation that the Collateral is free and clear of all encumbrances, security registrations, or other circumstances that would impact the transferability of ownership of the Collateral;
   2.9. If applicable, RMFS receiving possession of the Collateral;
      2.9.1. If the Borrower is to maintain possession of the Collateral as outlined in the Specific Information of this Agreement, the Borrower must not (i) part with possession of the Collateral; (ii) allow anyone else to use the Collateral; (iii) in any way alter the Collateral without written consent from RMFS; (iv) use the Collateral for rallies, classic racing, and/or track use; (v) use the Collateral in a way that will negatively impact the value of the Collateral; and (vi) take or allow the Collateral to be taken or sent out of the country it is located in at the time of the signing of this Agreement without RMFS' previous written consent
         2.9.1.1. The Borrower will obtain and maintain in force at all relevant times all licenses and permissions required to operate the Collateral.
   2.10. If applicable, inspection of the Collateral at RMFS' option;
   2.11. The Borrower warranting that the Collateral has its original factory installed chassis, engine, transmission, body panels, and all major components that the Collateral was delivered with when new;
      2.11.1. If the Collateral does not conform to the above description, the Borrower must provide a full and accurate description of the Collateral to RMFS which RMFS approves.
   2.12. The Borrower hereby granting and pledging to RMFS a security interest in the Collateral to secure the Borrower's indebtedness (Financing, applicable Interest, applicable Default, applicable Default Interest, and applicable Expenses);
      2.12.1. In addition to the rights and remedies set forth herein, RMFS may exercise any rights and remedies granted to secured parties under Article 9 of the Uniform Commercial Code.
   2.13. The Borrower executing the attached Continuing Power of Attorney (Attachment "A") granting RMFS:
      2.13.1. The authority to register a lien against the Collateral (approximately $100.00 USD);
      2.13.2. The authority to file or register any other applicable encumbrance on the Collateral and/or the Borrower;
      (clauses 2.13 to 2.13.2 together "**Filing Expenses**")
      2.13.3. The authority to sell the Collateral if a Termination Event(s) occurs; and
      2.13.4. The authority to satisfy any debts or charges that create an encumbrance on the Title to the Collateral to any financial institutions, automotive finance companies, automotive lenders, or any other similar individuals or institutions.
   2.14. If applicable, the Borrower executing the attached Power of Attorney appointing Wolters Kluwer Lien Solutions, or other third party as RMFS deems appropriate, the authority to register a lien on the Collateral on behalf of RMFS in its respective State (Attachment "B");
   2.15 If applicable, the Borrower executing a Collateral Storage Agreement (Attachment "C"); and
   2.16 The Borrower acknowledging (as a continuing obligation) to provide any related supporting documentation that may be required to register the lien, UCC filing, or any other applicable encumbrance.
   (clauses 2.1 to 2.16 together "**Financing Contingencies**")
   2.17. In the event that any of the Financing Contingencies are breached, the Borrower will INDEMNIFY, DEFEND (WITH RMFS' SOLE CHOICE OF COUNSEL), AND HOLD RMFS AND ITS AFFILIATES HARMLESS FROM ANY CLAIMS, DEMANDS, LOSSES, EXPENSES, DAMAGES, COSTS, ACTIONS, AND LIABILITIES, INCLUDING WITHOUT LIMITATION TO COURT COSTS AND ATTORNEYS' FEES, OF WHATEVER KIND OR NATURE THAT MAY OR MAY NOT OCCUR, WHETHER KNOWN OR UNKNOWN, ON THE ACCOUNT OF, ARISING OUT OF, OR RELATED TO THE COLLATERAL OR THE TERMS AND CONDITIONS OF THIS AGREEMENT.

3. **Repayment of Financing, Applicable Interest, and Applicable Expenses:** The Borrower is responsible to repay RMFS the Financing, applicable Interest, and applicable Expenses (as incurred) ("**Repayment**") If Repayment is not made to RMFS by the Repayment Date as outlined in the Specific Information of this Agreement, this is a default ("**Default**")

4. **Termination Event(s):**
   4.1 RMFS may take any and/or all of the actions outlined in clause 4.2 of this Agreement immediately if any of the following events occurs:
      4.1.1 If any of the Financing Contingencies are breached and/or not fulfilled;
      4.1.2 If Repayment is outstanding and, an extension is not agreed upon and/or requested;
      4.1.3 If there is a Default;
      4.1.4 If there is a Missed Interest Payment (and this is not cured within 15 business days);
      4.1.5 If the Borrower breaches any term of this Agreement and/or Continuing Power of Attorney/Power of Agency;
      4.1.6 If the Borrower does anything which may prejudice RMFS' rights to or in the Collateral.

X _____
Borrower's Initials

5

FNCL-21-00003

4.1.7. If RMFS becomes aware that any information supplied by the Borrower is false;

4.1.8. If the Collateral (or any of them) become an actual or constructive total loss;

4.1.9. If there is any change in control of the Borrower's company or its ultimate holding company;

4.1.10. If there is an insurable loss for diminished value or total loss;

4.1.11. If a receiver, administrator, trustee, administrative receiver or liquidator ("**administrator**") is appointed over all or any part of the Borrower's assets, or any person who is entitled to do so takes any steps to appoint an administrator over any of the Borrower's assets or files such a notice with the court, or the Borrower ceases or threatens to cease trading, or the Borrower convenes any meeting of or enters into any arrangement with the Borrower's creditors or any of them;

4.1.12. If a landlord levies or attempts to levy distress on the Collateral or any premises where the Collateral may be;

4.1.13. If being an individual, the Borrower dies or becomes bankrupt or a petition is presented, or an application is made for an interim order or a bankruptcy order;

4.1.14. If the Borrower is a partnership and any of the partners dies, or a petition is presented for an administration order to be made in relation to or a resolution is passed for the winding up or dissolution of the partnership or a petition is presented for a bankruptcy order to be made against one or more of the partners for non-payment of a partnership debt or any one or more of the partners enters into a voluntary arrangement with its creditors;

4.1.15. If RMFS has reasonable grounds to believe the Collateral, or RMFS' interest in them, is at risk;

4.1.16. If the Borrower fails to make the Diminution of Price Payment (defined below); or

4.1.17. If any event occurs which, in RMFS' opinion, has or is likely to have a material adverse effect on the Borrower's business, properties or condition, financial or otherwise or on the Borrower's ability to duly perform and observe its obligations under this Agreement.

(clause 4.1 to 14.1.17 together "**Termination Event(s)**")

4.2. If any of the Termination Event(s) occurs, RMFS has the right to take any and/or all of the following actions:

4.2.1. RMFS has the right to possession of the Collateral.

4.2.2. The Borrower will be charged a non-payment fee equaling 1% of the outstanding Financing ("**Non-Payment Fee**"). The Non-Payment Fee will be added to the amount to be repaid with the Financing under this Agreement.

4.2.3. The Borrower will be charged a Default Interest of the U.S. Prime Rate + 10.0% per annum which will be charged on the Financing and applicable Expenses ("**Default Interest**") from the date the Default occurs until the Financing and applicable Expenses are entirely recovered by RMFS. The Default Interest will be added to the amount to be repaid with the Financing under this Agreement.

4.2.3.1. There is no relief from payment of the Default and/or Default Interest for any reason, including but not limited to, court and/or bankruptcy proceedings.

4.2.4. Upon RMFS providing written notice of the Termination Event(s), the Borrower will have 15 business days to make Repayment to RMFS; if the Borrower fails to pay RMFS, RMFS has the unilateral right to sell the Collateral either via auction or private sale in accordance with the sub-clauses below:

4.2.4.1. If the Collateral is sold via an absolute auction, (i) the Collateral will be offered without reserve; (ii) RMFS will collect a 5.0% Seller's Commission and the standard Buyers' Premium from the sale of the Collateral (this Seller's Commission and Buyers' Premium will not be used to cover any amounts owed under this Agreement); and (iii) the last accepted bid will be retained by RMFS to be applied to any amounts owed under this Agreement. Any excess funds once these amounts are deducted will be returned to the Borrower;
OR

4.2.4.2. If the Collateral is sold via private sale to a third party in an arms-length transaction, (i) RMFS will collect a 10.0% private sale commission from the sale of the Collateral (this private sale commission will not be used to cover any amounts owed under this Agreement) and (ii) the net proceeds of the sale will be retained by RMFS to be applied to any amounts owed under this Agreement. Any excess net proceeds once these amounts are deducted will be returned to the Borrower.

4.3. Any reasonable expenses incurred for RMFS to sell the Collateral in accordance with clause 4.2.4, including but not limited to shipping, storage, detailing, and repairs, shall be charged to the Borrower ("**Default Expenses**").

4.4. If the Financing, applicable Interest, applicable Default, applicable Default Interest, and applicable Expenses (i) are not fully recovered from the net proceeds of the sale of the Collateral in accordance with clause 4.2.4; OR (ii) RMFS is unable to sell the Collateral in accordance with clause 4.2.4 for any reason and, RMFS provides notice of such, then the Borrower shall pay the amount outstanding (the "**Deficiency**") to RMFS within either (i) 5 business days of RMFS providing notice to the Borrower of the sale of the Collateral; OR (ii) within 5 business days of RMFS providing notice to the Borrower that RMFS cannot sell the Collateral in accordance with clause 4.2.4.

4.5. The Borrower is obligated to pay any and all costs incurred by RMFS in recovering the Deficiency including, but not limited to, court costs and attorney fees ("**Deficiency Enforcement Costs**").

4.6. The Borrower is obligated to pay Deficiency Interest of the U.S. Prime Rate + 10% per annum on the Deficiency and applicable Deficiency Enforcement Costs ("**Deficiency Interest**") from the date the Deficiency occurs until the Deficiency, Deficiency Interest and applicable Deficiency Enforcement Costs are entirely recovered by RMFS.

4.7. There is no relief from payment of the Deficiency and/or Deficiency Interest for any reason, including but not limited to, court and/or bankruptcy proceedings.

4.8. The Borrower acknowledges that RMFS will retain and sell any other items of property owned by the Borrower in RMFS' possession if the Deficiency, Deficiency Enforcement Costs, and Deficiency Interest are not paid back in accordance with clause 4.4, 4.5 and 4.6 of this Agreement.

4.9. The remedies contained in clause 4.1 through clause 4.8 of this Agreement do not limit RMFS' other applicable remedies under law, and if the Deficiency, Deficiency Enforcement Costs, and Deficiency Interest are not paid to RMFS in accordance with clause 4.1 through clause 4.8 of this Agreement, RMFS may utilize all other remedies available under law to recover the Deficiency, Deficiency Enforcement Costs, and Deficiency Interest.

5. **Valuation:** On each anniversary of this Agreement, RMFS shall have the option to obtain, at its own cost and reasonable discretion, a third-party valuation of the Collateral ("**Anniversary Valuation**"). If the Anniversary Valuation determines that the value of the Collateral has decreased by 10.0% or more (in comparison to the Insured Value of the Collateral as outlined in the Specific Information of this Agreement), RMFS has the right to demand a payment of this drop in value in one lump sum payment ("**Diminution of Price Payment**"). The Diminution of Price Payment is to be paid on the next Interest payment date.

6. **Title, Registration Documents, and/or Appropriate Documents Evidencing Chain of Ownership:**

6.1. The Borrower is obligated to provide RMFS with a copy of the Title to the Collateral within 5 calendar days of signing this Agreement.

6.1.1 If for whatever reason RMFS is forced to correct any Title defect, the Borrower agrees to pay for any and all reasonable expenses ("**Title Correction Expenses**").

6.1.2 As part of RMFS' due diligence process to ensure the Title to the Collateral is clear and transferable, RMFS will perform a DMV Lien Search (approximately $50.00 USD), a National Motor Vehicle Title Information System Search (approximately $9.00 USD), a CARFAX Report (approximately $15.00 USD) (if possible due to the age of the Collateral and VIN length), and a UCC Lien Search (approximately $50.00 USD), and these expenses will be will be added to the amount to be repaid with the Financing under this Agreement ("**Due Diligence Expenses**").

6.2. The Borrower warrants that the Borrower is the sole owner of the Collateral and that the Borrower has full right and authority to sell the Collateral.

6.3. RMFS is not responsible to provide the Borrower with a temporary operating permit or similar temporary permit nor, provide advice to the Borrower on how to obtain a temporary operating permit or similar temporary permit.

6.4. The Borrower may obtain a temporary operating permit, however, the Borrower is solely responsible to obtain such work, work with any title service agency, and the payment of any associated fees.

6.5. RMFS will register its security interest on the Title to the Collateral utilizing a third-party titling service and, the Borrower will be responsible for payment of any associated fees. The physical registration of the security interest is jurisdiction dependent and, generally can take, at minimum, 4 weeks from when the Title paperwork is submitted

X _____ Borrower's Initials

6

PS-19-00043

to the applicable Department of Motor Vehicles (or equivalent).

6.5.1 The Borrower acknowledges that delays in registering the security interest due to delays at government Motor Vehicle departments (or equivalent) happen from time-to-time and, the Borrower will hold RMFS harmless from any allegations of damages arising out of government delays.

6.6 The applicable Expenses are not official fees and are not required by law. The applicable Expenses may result in a profit to RMFS. No portion of the applicable Expenses are for the drafting, preparation, or completion of documents or the providing of legal advice or tax advice documents or the providing of legal advice or tax advice.

6.7 The Borrower will INDEMNIFY, DEFEND (WITH RMFS' SOLE CHOICE OF COUNSEL), AND HOLD RMFS AND ITS AFFILIATES HARMLESS FROM ANY CLAIMS, DEMANDS, LOSSES, EXPENSES, DAMAGES, COSTS, ACTIONS, AND LIABILITIES, INCLUDING WITHOUT LIMITATION TO COURT COSTS AND ATTORNEYS' FEES, OF WHATEVER KIND OR NATURE THAT MAY OR MAY NOT OCCUR, WHETHER KNOWN OR UNKNOWN, ON THE ACCOUNT OF, ARISING OUT OF, OR RELATED TO THE TITLE (WHICH INCLUDES THE ORIGINAL TITLE, REGISTRATION DOCUMENTS, OR ANY OTHER TYPE OF OWNERSHIP DOCUMENTS AND/OR GOVERNMENT REGISTRATIONS (SUCH AS PURCHASE AGREEMENTS AND BILLS OF SALE) THAT THE APPLICABLE JURISDICTION REQUIRES TO REGISTER OWNERSHIP TO THE COLLATERAL)

7. **Definitions:**

7.1 "Administration Costs" shall refer to reasonable administration costs for any failure by the Borrower to comply with the terms of this Agreement.

7.2 "Expenses" includes but is not limited to the Filing Expenses, applicable administration fee of $150.00 USD, applicable Insurance Expenses, applicable Title Correction Expenses, applicable Due Diligence Expenses, applicable Origination Fee, appliable Extension Fee, applicable Transportation and Storage Expenses, applicable Default Expenses, applicable Diminution of Price Payment, applicable title registration fees, applicable Administration Costs, and applicable Non-Payment Fee as outlined and defined in this Agreement.

7.3 "Term" shall refer to the time period consisting of the date of the signing of this Agreement until the Financing, applicable Interest, and applicable Expenses are either (i) fully repaid to RMFS in accordance with the Repayment Date or (ii) fully repaid to RMFS in accordance with clause 4.1 through clause 4.9 of this Agreement.

7.4 "Title" includes but is not limited to the original title, registration documents, or any other type of ownership documents and/or government registrations (such as Purchase Agreements and Bills of Sale) that the applicable jurisdiction requires to register ownership to the Collateral.

8. **Assignment of Rights:**

8.1 The Borrower agrees that RMFS may assign, sell, and/or pledge, entirely or in parts ("Assign" or "Assigns" or "Assigned" or "Assignment") (third party who is assigned rights is an "Assignee(s)") without limitation any and all rights, obligations, and/or remedies and/or relief as provided by law ("Rights") that RMFS is entitled to/obligated by under this Agreement to any Assignee(s) (including, but not limited to, any RMFS affiliate, and for security/Collateral purposes, to any financing sources of RMFS).

8.2 RMFS may assign insurance to an alternative insurance provider.

8.3 Following any Assignment in accordance with the terms hereof, any reference in this Agreement to any Rights that RMFS is entitled to/obligated by under this Agreement, shall be held by RMFS shall be held by RMFS on behalf of and for the benefit of itself and any Assignee(s). The Borrower hereby agrees to promptly execute and deliver any amendment or supplement to this Agreement reasonably requested by RMFS in connection with any Assignment in accordance with the terms hereof.

8.4 The Borrower may not Assign the Rights that the Borrower is entitled to/obligated by, under this Agreement to any other individual or entity without the express written permission of RMFS.

9. **Other:**

9.1 The Financing is obtained by the Borrower for business purposes and not for personal, family, or household purposes. The Borrower disclaims to the fullest extent possible any and all rights under state and federal consumer-lending statutes or regulations.

9.2 This Agreement is an important legal document. The Borrower acknowledges that the Borrower has had the opportunity to consult an attorney before signing this Agreement and has signed this Agreement after having the opportunity to consult with an attorney of his/her/its own choosing. Notwithstanding any references to any transactions or arrangements in this Agreement, or any contemporaneous written, oral, or implied understandings of the Parties relating to the subject matter of this Agreement, RMFS has not provided legal or tax advice or tax planning services to the Borrower or for the Borrower's benefit in connection with the transactions contemplated by this Agreement, and no one at RMFS has acted as the Borrower's attorney or tax advisor.

9.3 The Borrower agrees to allow RMFS to use the Borrower's personal information in accordance with the RM Sotheby's ("RMS") privacy policy found at https://rmsothebys.com/en/home/privacy-terms. RMFS uses the Borrower's personal information to provide services specifically tailored toward the Borrower's requirements and to treat the Borrower in a personal way; to fulfill the Borrower's agreements regarding the consignment and purchase of items at RMS auctions and private sales; to provide the Borrower with information on upcoming sales; to carry out analysis and market research; to undertake targeted online advertising; to send status updates and service communications; to improve RMFS' websites, products, and services; to provide payment services, and for management and administrative purposes. The full Privacy Policy can be found at the bottom of the RMS website homepage under the Privacy & Terms tab. If the Borrower wishes to ask any questions regarding the use of the Borrower's personal information, request a full accounting of what personal information is on file with RMFS and RMS, unsubscribe from any services, or purge the Borrower's personal information from RMS' systems, please email privacy@rmsothebys.com.

9.4 RMFS hereby notifies the Borrower that RMFS is required to obtain, verify, and record information that identifies the Borrower pursuant to the requirements of the *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act* of 2001, Public Law 107-56 (commonly known as the *USA Patriot Act*), as amended (the "Act"), which information includes the Borrower's name and address and other information that will allow RMFS to identify the Borrower in accordance with the Act.

9.5 The Borrower agrees to provide RMFS with such information as RMFS may request in order for RMFS to comply with its ongoing obligations under applicable "Know Your Client" and anti-money laundering rules and regulations.

9.6 If any term of this Agreement is invalid or unenforceable, that term shall be deemed modified or deleted but only to the extent necessary to comply with the statute, regulation, ordinance, order, or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

9.7 All payments shall be made by way of direct debit to RMFS' bank account in immediately available cleared funds (free and clear of and without deduction for or on account of any set-off, withholding or counterclaim except to the extent, if any, required by law in respect of withholding or deduction of tax).

9.8 RMFS may deduct from any sum due to the Borrower under this or any other agreement with the Borrower, any sum recoverable from or payable by the Borrower under this Agreement.

9.9 If the date of payment of any amount under this Agreement is on a holiday, the payment shall be made on the next business day.

9.10 RMFS reserves the right to put a tracker on the Collateral prior to delivery to the Borrower and the Borrower shall be responsible for the cost of the tracker service during the duration of this Agreement. The Borrower must produce evidence of the tracker service being in place and operational to RMFS on demand.

9.11 RMFS may pay a commission to a third party who assists RMFS with the purchase of the Collateral ("Third Party Commission"). Upon request from the Collateral, RMFS will share with the Collateral any details regarding the Third-Party Commission. By signing this Agreement, the Borrower consents to RMFS paying the Third-Party Commission to the third party (if any).

9.12 RMFS' rights under this Agreement will not be affected by any forbearance or concession made by RMFS to the Borrower. RMFS will only grant a waiver for breach by the Borrower in limited circumstances and any such waiver will only be effective if given in writing by RMFS and it refers to the breach to be waived. All RMFS' rights and remedies in this Agreement shall be in addition to RMFS' rights under general law including RMFS' rights to claim damages.

9.13 If more than one person entered into this Agreement as a Borrower, the Borrower is jointly and severally liable for the Borrower's obligations.

9.14 The Parties agree that neither they nor their respective affiliates, employees, or representatives will disclose or allow disclosure of the terms of this Agreement to any party other than their own respective entities, personnel, and agents on a need-to-know basis without the express prior written approval of the other Party.

9.15 This Agreement may be executed in counterparts, each of which shall be deemed an original, and each of which together shall constitute one and the same instrument. A counterpart signature page of this Agreement executed by a Party and transmitted electronically in either Tagged Image Format Files (TIFF) or Portable Document Format (PDF) shall be treated as an original, fully binding and with full legal force and effect, and the Parties waive any rights they may have to object to such treatment.

9.16 This Agreement shall be interpreted in accordance with the laws of the State of Michigan, U.S., without regard to choice of law principles. Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement shall exclusively be subject to arbitration, and shall first

X ⎯⎯⎯⎯⎯⎯⎯⎯
Borrower's Initials

7

PS-19-00043

be subject to mediation as a condition precedent to arbitration. If mediation is unsuccessful, the parties shall proceed to arbitration near Detroit, Michigan, before one arbitrator and all proceedings shall be conducted in English. The mediation and arbitration shall be administered by the American Arbitration Association pursuant to the AAA Commercial Arbitration Rules and Mediation Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. In the event that either party brings action against the other, arising from or relating to this Agreement, the prevailing party, as determined by the arbitrator or court, shall be entitled to recover its reasonable attorneys' fees and costs, including through appeals. For the avoidance of doubt, the pendency of any dispute between the Parties shall not affect the ongoing accrual of Interest until all outstanding balances, accrued Interest, and expenses and fees have been repaid by Borrower.

9.17 This Agreement constitutes the entire agreement between the Parties and, except as stated herein and in the instruments and documents to be executed and delivered, contains all the representations, conditions, and warranties of the respective Parties.

9.18 This Agreement may not be amended or modified in any respect, except by written instrument signed by both Parties.

X _____
Borrower's Initials

8

PS-19-00043

 **Financial Services**

**FINANCING AND SECURITY AGREEMENT**
**ATTACHMENT "A" - CONTINUING POWER OF ATTORNEY/POWER OF AGENCY ("CONTINUING POWER OF ATTORNEY")**

THIS CONTINUING POWER OF ATTORNEY is given by Jean Guikas of GTC SASU, 5, Avenue Lavoisier, Carnoux-en-Provence, 13470, FR ("**Jean Guikas**", "**GTC SASU**", "**me**", "**myself**", and/or "**I**").

1. **REVOCATION:** I hereby revoke any prior power of attorney/power of agency for the (i) 1972 Ferrari 312 PB, Chassis No.: 0886; (ii) Alfa Romeo 2500 SS 256, Chassis No.: 915026; (iii) ISO/A3C, Chassis No.: B0204; (iv) Williams F1 W14 (the "**Williams**"); and (v) 1972 Matra 670, Chassis No.: 02 (collectively, with all their parts, accessories, and documentation that are owned by or in my possession or control or my current lender's, or which later come into my ownership, possession or control, "**Collateral**") or any prior power of attorney/power of agency previously given by me that affects the Collateral.

2. **APPOINTMENT AND AUTHORIZATION:** I do hereby constitute and appoint RM Financial Services LLC, and any affiliated, successor, or designated companies ("**RMFS**") and RMFS employees acting in their capacity as an RMFS representative to be my lawful Attorney-in-Fact. I specifically provide my Attorney with and only the following powers:

    2.1 The authority to register a lien in the amount of the Financing, applicable Interest, and applicable Expenses against the Collateral (as defined in this Financing and Security Agreement ("**Agreement**"));

    2.2 The authority to file or register any other applicable encumbrance against the Collateral and/or myself in the amount of the Financing, applicable Interest, and applicable Expenses;

    2.3 The authority to sell the Collateral if the Financing, applicable Interest, and applicable Expenses are not fully paid to RMFS by the Repayment Date (as defined in the Agreement);

    2.4 The authority to pay out any financing arrangements that create an encumbrance on the Title (as defined in the Agreement) to the Collateral to any financial institutions, automotive finance companies, automotive lenders, or any other similar individuals or institutions;

    2.5 Executing documents required to transfer ownership of the Collateral in accordance with the Agreement signed between myself and RMFS.

3. **AFFIRMATION:** In granting this Continuing Power of Attorney, I affirm that I am aware of the authority this Continuing Power of Attorney is granting, specifically the power as outlined in clause 2.1, 2.2, 2.3, 2.4, and 2.5.

4. **DATE OF EFFECTIVENESS:** This Continuing Power of Attorney will come into effect on the date it is signed and witnessed. It is my intention, and I so authorize my Attorney, that this authority may be exercised from that date forward.

_JEAN GUIKAS_  
Printed Name Grantor | Signature of Grantor

I _____ (Notary) this _____ day of _____ (month), _____ (year) affirm that Jean Guikas of GTC SASU subscribed and swore this Continuing Power of Attorney.

(Signature of Notary)

(Notary Seal)

X _____  
Borrower's Initials

9

PS-19-00043



**FINANCING AND SECURITY AGREEMENT**
**ATTACHMENT "B" – PERSONAL GUARANTEE ("GUARANTEE")**

**DATED AS OF** 14 December 2021

**PARTIES** subject to this Guarantee are:

A. RM Financial Services LLC of 5536 County Road 11A, Auburn, IN 46706 and its respective affiliates, successors, or designates ("**RMFS**");

B. Jean Guikas of 5, Avenue Lavoisier, Carnoux-en-Provence, 13470, FR and his respective affiliates, successors, or designates ("**Guikas**"); and

C. GTC SASU of 5, Avenue Lavoisier, Carnoux-en-Provence, 13470, FR and its respective affiliates, successors, or designates ("**GTC**").

("**Party**" or together "**Parties**")

**WHEREAS** the Guarantor is providing a personal guarantee for the obligations of the Customer as outlined in the Financing and Security Agreement ("**Financing Agreement**") with RMFS in accordance with the terms and conditions of this Guarantee.

**IN CONSIDERATION** of the respective covenants and agreements contained in this Guarantee incorporating the preamble above in its entirety and, for other good and valuable consideration (the receipt and sufficiency of which are mutually acknowledged), the Parties covenant and agree as follows:

1. **Guarantee and Indemnity:** The Guarantor unconditionally and irrevocably guarantees to RMFS the obligations of the Customer to pay the Deficiency, Deficiency Interest, and Deficiency Enforcement Costs as outlined in the Financing Agreement ("**Guaranteed Obligations**") (Clause 1 in its entirety "**Specific Information**").

2. **Overriding Clause:** If there is a conflict between the Specific Information and the Conditions of Business and/or Attachment(s), the Specific Information will override.

3. **Specific Information:** To be clear, the defined term "Specific Information" is meant to clarify the terms and conditions of this Guarantee that are varied from the enclosed Personal Guarantee Conditions of Business ("**Conditions of Business**") which form the contractual basis of this Guarantee.

**SIGNATURES:**

The Parties acknowledge and agree to be bound by this Guarantee which includes all the Specific Information outlined, Conditions of Business, and Attachment(s) contained within the multiple pages of this Guarantee.

**GUARANTOR:**                                           **RM FINANCIAL SERVICES LLC:**

By: Jean Guikas                                          By: [signature]
Title:                                                   Title: SVP RMFS
Date: 16/12/21                                           Date: 12/16/2021

**CUSTOMER:**

By: Jean Guikas
Title: President
Date: 16/12/21

GTC
5, avenue Lavoisier
13470 Carnoux-en-Provence
FRANCE
Tél. 04 42 72 61 99
RCS Marseille B 349 432 930
www.guikasgtc.com

X _____
Borrower's Initials

10

PS-19-00043

1. **Guarantee and Indemnity:**
1.1 This Guarantee is and shall at all times be a continuing security and shall cover the Guaranteed Obligations of the Customer to RMFS.
1.2 The Guarantor hereby undertakes to RMFS that its liability hereunder shall not be impaired, reduced or discharged by:
   1.2.1 any intermediate payment, settlement of account or discharge in whole or in part of the Guaranteed Obligations;
   1.2.2 any variation, extension, discharge, compromise, dealing with, exchange or renewal of any right or remedy which RMFS may now or after the date of this Guarantee have from or against any of the Customer and any other person in connection with the Guaranteed Obligations;
   1.2.3 any act or omission by RMFS or any other person in taking up, perfecting or enforcing any security, indemnity, or guarantee from or against the Customer or any other person;
   1.2.4 any termination, amendment, variation, novation, replacement or supplement of or to any of the Guaranteed Obligations including, without limitation, any increase in or extension of the Guaranteed Obligations and any addition of new Guaranteed Obligations;
   1.2.5 any grant of time, indulgence, waiver or concession to the Customer or any other person;
   1.2.6 any insolvency, bankruptcy, liquidation, administration, winding up, incapacity, limitation, disability, the discharge by operation of law, or any change in the constitution, name or style of the Customer or any other person;
   1.2.7 any invalidity, illegality, unenforceability, irregularity or frustration of any actual or purported obligation of, or security held from, the Customer or any other person in connection with the Guaranteed Obligations;
   1.2.8 any claim from the Customer or any other person; or
   1.2.9 any act or omission which would not have discharged or affected the liability of the Guarantor had it been a principal debtor instead of a guarantor, or indemnifier or by anything done or omitted by any person which but for this provision might operate to exonerate or discharge the Guarantor or otherwise reduce or extinguish its liability under this Guarantee.

2. **Termination:**
2.1 The Guarantor may not terminate this Guarantee by notice to RMFS or otherwise.
2.2 Provided the Guaranteed Obligations have been unconditionally paid in full, RMFS may discharge or release the Guarantor by written instrument signed by RMFS.

3. **Further Assurances:**
3.1 The Guarantor agrees to do or execute any further assurances and documents that may be required by law or that RMFS may consider necessary to establish, maintain and protect its rights and generally to carry out the true intent of this Guarantee.
3.2 The Guarantor will promptly execute all documents reasonably requested by RMFS to effect, perfect, record or implement any such assignment, novation or transfer and will promptly comply with any other reasonable requests RMFS, its successors and assigns in respect of any such assignment, novation or transfer.
3.3 The Guarantor warrants and represents to RMFS on each day when the Guaranteed Obligations are outstanding that there are no amounts owing from the Customer to the Guarantor and/or any third party that would rank ahead of the Guaranteed Obligations.

4. **Assignment of Rights:**
4.1 The Guarantor agrees that RMFS may assign, sell, and/or pledge, entirely or in parts ("**Assign**" or "**Assigns**" or "**Assigned**" or "**Assignment**") (third party who is assigned rights is an "**Assignee(s)**") without limitation any and all rights, obligations, remedies and/or relief as provided by law ("**Rights**") that RMFS is entitled to/obligated by under this Guarantee to any Assignee(s) (including, but not limited to, any RMFS affiliate and, for security/collateral purposes, to any financing sources of RMFS).
4.2 RMFS may assign insurance to an alternative insurance provider.
4.3 Following any Assignment in accordance with the terms hereof, any reference in this Guarantee to any Rights that RMFS is entitled to/obligated by under this Guarantee, shall also be held by RMFS on behalf and for the benefit of itself and any Assignee(s). The Guarantor hereby agrees to promptly execute and deliver any amendment or supplement to this Guarantee reasonably requested by RMFS in connection with any Assignment in accordance with the terms hereof.
4.4 The Guarantor may not Assign the Rights that the Guarantor is entitled to/obligated by, under this Guarantee to any other individual or entity without the express written permission of RMFS.

5. **Other:**
5.1 If any term of this Guarantee is invalid or unenforceable, that term shall be deemed modified or deleted but only to the extent necessary to comply with the statute, regulation, ordinance, order, or rule, and the remaining provisions of this Guarantee shall remain in full force and effect.
5.2 The Guarantor agrees to allow RMFS to use the Guarantor's personal information in accordance with RMFS' privacy policy. RMFS uses the Guarantor's personal information to provide services specifically tailored toward the Guarantor's requirements and to treat the Guarantor in a personal way, to fulfill the Guarantor's agreements regarding the consignment and purchase of items at RMFS auctions and private sales; to provide the Guarantor with information on upcoming sales; to carry out analysis and market research; to undertake targeted online advertising; to send status updates and service communications; to improve RMFS' websites, products, and services; to provide payment services, and for management and administrative purposes. The full Privacy Policy can be found at the bottom of the RMFS website homepage under the Privacy & Terms tab. If the Guarantor wishes to ask any questions regarding the use of the Guarantor's personal information, request a full accounting of what personal information is on file with RMFS, unsubscribe from any services, or purge the Guarantor's personal information from RMFS' systems, please email privacy@rmsothebys.com.
5.3 RMFS hereby notifies the Guarantor that RMFS is required to obtain, verify, and record information that identifies the Guarantor pursuant to the requirements of the *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act* of 2001, Public Law 107-56 (commonly known as the *USA Patriot Act*), as amended (the "**Act**"), which information includes the Guarantor's name and address and other information that will allow RMFS to identify the Guarantor in accordance with the Act.
5.4 The Guarantor agrees to provide RMFS with such information as RMFS may request in order for RMFS to comply with its ongoing obligations under applicable "Know Your Client" and anti-money laundering rules and regulations.
5.5 All payments shall be made by way of direct debit to RMFS' bank account in immediately available cleared funds (free and clear of and, without deduction for or on account of any set-off, withholding or counterclaim except to the extent, if any, required by law in respect of withholding or deduction of tax).
5.6 If the date of payment of any amount under this Guarantee is on a holiday, the payment shall be made on the next business day.
5.7 RMFS' rights under this Guarantee will not be affected by any forbearance or concession made by RMFS to the Guarantor. RMFS will only grant a waiver for breach by the Guarantor in limited circumstances and any such waiver will only be effective if given in writing by RMFS and it refers to the breach to be waived. All RMFS' rights and remedies in this Guarantee shall be in addition to RMFS' rights under general law including RMFS' rights to claim damages.
5.8 If more than one person entered into this Guarantee as a Guarantor, the Guarantor is jointly and severally liable for the Guarantor's obligations.
5.9 The Parties agree that neither they nor their respective affiliates, employees, or representatives will disclose or allow disclosure of the terms of this Guarantee to any party other than their own respective entities, personnel, and agents on a need-to-know basis without the express prior written approval of the other Party.
5.10 This Guarantee may be executed in counterparts, each of which shall be deemed an original, and each of which together shall constitute one and the same instrument. A counterpart signature page of this Guarantee executed by a Party and transmitted electronically in either Tagged Image Format Files (TIFF) or Portable Document Format (PDF) shall be treated as an original, fully binding and with full legal force and effect, and the Parties waive any rights they may have to object to such treatment.
5.11 This Guarantee shall be interpreted in accordance with the laws of the State of Michigan, U.S., without regard to choice of law principles. Any dispute, claim, or controversy arising out of or relating to this Guarantee or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Guarantee shall exclusively be subject to arbitration, and shall first be subject to mediation as a condition precedent to arbitration. If mediation is unsuccessful, the Parties shall proceed to arbitration near Detroit, Michigan, before one arbitrator, and all proceedings shall be conducted in English. The mediation and arbitration shall be administered by the American Arbitration Association pursuant to the AAA Commercial Arbitration Rules and Mediation Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. In the event that either Party brings action against the other, arising from or relating to this Guarantee, the prevailing party, as determined by the arbitrator or court, shall be entitled to recover its reasonable attorneys' fees and costs, including through appeals. For the avoidance of doubt, the pendency of any dispute between the Parties shall not affect the ongoing accrual of Deficiency Interest until all outstanding balances, accrued Deficiency Interest, and expenses and fees have been repaid by the Customer.
5.12 This Guarantee may not be amended or modified in any respect, except by written instrument signed by the Parties.

X _____
Borrower's Initials

PS-19-00043