# Exhibit B

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitral Tribunal

---

RM Auctions, Inc. d.b.a. RM Sotheby's and
RMS Financial Services LLC,

       Claimants,

v.

GTC SASU, Jean Guikas,

       Respondents.

ICDR Case No. 01-23-0001-2380

---

## **FINAL ARBITRATION AWARD**

Peter V. Baugher, Arbitrator
Baugher Dispute Resolution LLC
130 North Garland Court – Suite 4101
Chicago, Illinois 60602
+1 847-912-1716
pbaugher@baugherlegal.com
www.baugherlegal.com

April 12, 2024

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitral Tribunal

RM Auctions, Inc. d.b.a. RM Sotheby's and
RMS Financial Services LLC,

        Claimants,

v.                                                    ICDR Case No. 01-23-0001-2380

GTC SASU, Jean Guikas,

        Respondents.

# FINAL ARBITRATION AWARD

      I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated December 15, 2021, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

**PROCEDURAL HISTORY, FACTS OF THE CASE, PARTIES' POSITIONS, STATEMENT OF REASONS**

## TABLE OF CONTENTS

Introduction (Pars. 1-2)

I. The Parties' Positions and Requests for Relief (Pars. 3-6)

II. Claimants and Respondents and Their Long Business Association (Pars. 7-10)

III. The Financing and Security Agreement Central to the Arbitration (Pars. 11-15)

IV. The Financing and Security Agreement Arbitration Provision (Pars. 16-18)

V. Pre-Merits Hearing Proceedings (Pars. 19-21)

VI. Respondents' Procedural Objections (Pars. 22-24)

VII. Preparation and Arrangements for the Merits Hearing (Pars. 25-27)

VIII. Hearing on the Merits (January 2024) (Pars. 28-46)

IX. Adverse Inference Against Respondents (Pars. 47-52)

1

X. Claimants' Damages Caused by Respondents' Breach of Contract (Par. 53)

XI. Prevailing Party Fees and Costs (Pars. 54-57)

XII. Scope of the Award (Pars. 58-59)

AWARD (Pars. 60-66)

**Introduction**

1. This Award culminates a year of preliminary and merits proceedings. Claimants are RM Auctions, Inc. d.b.a. RM Sotheby's and RMS Financial Services LLC. Respondents are GTC SASU and Jean Guikas. Claimants brought their Demand for Arbitration and filed their Statement of Claim with the American Arbitration Association/International Centre for Dispute Resolution (ICDR), the international division of the American Arbitration Association (AAA), on March 24, 2023. Respondents answered with their objections and defenses on August 28, 2023, revised on August 31, 2023, and October 12, 2023.

2. The arbitration is a multi-million euro breach of contract dispute between one of the world's largest collector car auction houses and a prominent collector and seller of finest brand cars in this luxury sector. Pitted against one another are sophisticated parties with long-standing business relationships represented by capable U.S. and French legal counsel. Aspects of the dispute may continue in related proceedings pending in France. That is for others to undertake consistent with their responsibilities. This Award gathers the facts and assesses the evidence asserted by both sides on the merits of the claimed breach and resulting damages alleged. It follows a full opportunity given to all parties to present their respective cases under the terms and in the forum they contractually specified. As to those matters it is intended to be complete and final.

**The Parties' Positions and Requests for Relief**

3. Claimants' Demand for Arbitration summarizes the relief sought attaching their Statement of Claim. The Statement of Claim alleges breach of a binding Financing and Security Agreement between Claimants and Respondents, supported by consideration. (Exhibit A to the Statement.) It asserts that Claimants fully performed their obligations under the Agreement. It states that Respondents breached the Agreement by failing to make interest payments due and to repay the principal amount plus outstanding interest and fees by the December 20, 2022 repayment date. Claimants state they demanded repayment from Respondents, who failed to comply. Claimants allege Respondents have thereby damaged them in the amount of outstanding balances due under the Agreement, plus all unpaid and accruing interest, expenses and fees.

4. Accordingly, Claimants request the Tribunal to enter an order: "(a) awarding judgment in their favor and against Respondents; (b) awarding Claimants compensatory damages in amount equal to all outstanding balances under the Agreement, plus all unpaid and accruing interest, expenses and fees; (c) awarding Claimants their reasonable attorneys' fees and costs (as required by Section 9.16 of the Agreement); and (d) granting any other relief the Arbitrator deems just and appropriate."

5. After some delays and extensions of time accorded to Respondents by the Tribunal with the acquiescence of Claimants (see Procedural Orders No. 1, August 14, 2023, and No. 2, August 31, 2023), Respondents submitted their Statement on Objections to Admissibility and Defence on the Merits (August 28, 2023, revised August 31, 2023, with a third version dated October 12, 2023. Respondents' Statement describes their view of the context of the claim and contractual relationship between the parties. These

2

include the Auction Agreement of March 3, 2021, and its two Advance Addendums (March 3, 2021 and August 30, 2021), the auction sale in Le Castellet, France, on November 19, 2021, and the closing of accounts between the parties in the Financing and Security Agreement (December 15, 2021). Respondents' Statement highlights a January 7, 2022 "trade invoice" issued by GTC that Respondents claim extinguished their debt under the First and Second Advances. The Statement notes various legal proceedings subsequently initiated by the parties, particularly, Receivership Proceedings commenced in France under a Commencement Order dated June 26, 2023. Respondents assert various procedural defenses to the arbitration—the receivership, mediation as a condition precedent to arbitration [agreed to be moot after a mediation was conducted and completed in early October 2023], irregularity of the constitution of the arbitral tribunal, proceedings pending before French courts on the same issues and between the same parties, and prospective violation of the arbitrator's duty to render an enforceable award. On the merits, Respondents assert that the transfer of possession of the Ferrari 312PB No. 0886 to RMS extinguished their debt, that RMS made no effort to sell the collateral Ferrari during the full year 2022, and that when RMS ultimately did sell the Ferrari in May 2023, it did so for a price "manifestly below its value" (August 31, 2023 Statement), "less than half of the contractually agreed value" (October 12, 2023 Statement). Claimants filed their Response to these allegations, purporting to correct or more fully and accurately describe communications and events pleaded by Respondents. See Claimants' Response to Respondent's Amended Statement on Objections to Admissibility and Defence on the Merits (September 20, 2023).

6. Respondents thus state the arbitral tribunal should consider that Respondents have paid their debt to Claimants, that Respondents made sufficient efforts to work with Claimants to sell the collateral Ferrari, and that Claimants failed to proceed with the sale of the Ferrari to the contractually agreed price. Accordingly, Respondents pray that the arbitrator: (a) invite Claimants to declare their claims as liabilities in compliance with the Claim Verification Proceedings in the Receivership commenced in Marseille June 26, 2023; (b) alternatively, dismiss all arbitration claims for want of jurisdiction and inadmissibility; (c) if the claims are not dismissed for want of jurisdiction and inadmissibility, dismiss Claimants' claims on the merits; and (d) order Claimants to bear all arbitration and mediation costs, as well as reasonable attorney fees and costs incurred by Respondents.

**Claimants and Respondents and Their Long Business Association**

7. Claimant RM Auctions, Inc. d.b.a. RM Sotheby's is one of the world's largest collector car auction houses. With 80 offices in 40 countries RM Auctions has a global client network. It had sales of $925 million in 2022. Claimant RMS Financial Services LLC is RM Auction's affiliated financial arm, financing transactions with its collector car purchaser clients.

8. Respondent GTC SASU describes itself in its Statement as "a company registered in France since 1989, specializing in the purchase and resale of classic cars. As such, G.T.C. owns one of the largest collections in Europe." Respondent Jean Guikas is its owner. He has more than three decades of experience in classic cars. His primary business is buying and selling such cars. He owns an extensive collection of classic Ferraris and other brands which Respondents self-describe as "the most selective and impressive worldwide classic car collection."

9. Respondents have been long-time clients of RM Auctions. Their primary business transactions have been through public classic car auction sales, on both the buy and sell sides.

10. At Mr. Guikas' direction the sale side has always been subject to "Advance on sale" terms. Under this arrangement RM Financial issued a loan to Guikas and his company, advancing funds to him. Guikas then consigned vehicles to RM Auctions public auctions. Guikas and GTC would repay RM Financial from proceeds of the auctions and/or per the parties' loan agreement.

3

**The Financing and Security Agreement Central to the Arbitration**

11. The parties' Financing and Security Agreement and ("Agreement" or "FSA" dated December 15, 2021) is Exhibit A to Claimants' Statement of Claim. It is also Exhibit No. 1 to Respondents' Statement on Objections to Admissibility and Defence on the Merits (August 28, 2023, revised August 31, 2023); Exhibit R-4 to the October 12, 2023 Statement. There is no dispute that the FSA and its accompanying Attachment A Continuing Power of Attorney and Attachment B Personal Guarantee of Respondent Jean Guikas were signed and agreed to, with good and valuable consideration mutually acknowledged, and were enforceable contracts as of December 15, 2021.

12. The Agreement's Whereas clauses describe its history (bolding in original):

"A. This Agreement is drafted to address a number of transactions that have occurred since March 2021 between the Parties; this Agreement will consolidate the transactions into one Agreement moving forward.

"B. In March 2021, the Parties entered into an Advance Addendum to the 2021 RM Sotheby's Guikas Collection Auction Consignment Agreement ("**Advance Addendum**") wherein, RMFS provided an advance of 18.000.00 EUR ("**Advance**") to the Borrower in consideration for the Borrower pledging the consigned auction cars as security.

"C. In August 2021, as outlined in the Second Advance Addendum to the 2021 RM Sotheby's Guikas Collection Auction Consignment Agreement ("**Second Advance Addendum**"), GTC subsequently agreed to purchase from RMS a 1970 Ferrari 512M 'Sunoco', VIN: 1040 ('**1040**'); 1960 Ferrari 250 GT LWB California Spyder, VIN: 1715GT ("**1715GT**"); and 1973 Ferrari 365 GTB/4 Daytona Competizione, VIN: 16367 ("**16367**") for a total purchase price of 29.600.000 EUR.

"D. As of the date of this Agreement, the Borrower wishes to (i) repay RMFS the Advance using the proceeds of sale from the recent Guikas Collection auction (the "**Proceeds**") and (ii) obtain financing from RMFS in the amount of 23.400.000 EUR, based on the Collateral (defined below), subject to and conditioned upon fulfillment of each of the Financing Contingencies as outlined and defined in the Conditions of Business (defined below) ("**Financing**"). To be clear, RMFS is not sending the Financing to the Borrower but rather, the Financing is credited towards the Borrower's outstanding account that would have otherwise been due to RMFS."

13. The Agreement further provides: "**IN CONSIDERATION** of the respective covenants and agreements contained in this Agreement, including, the preamble above which is incorporated below, in its entirety and, for other good and valuable consideration (the receipt and sufficiency of which are mutually acknowledged), the Parties covenant and agree as follows: 1. Collateral Description(s): The Collateral described in this Agreement a (i) 1972 Ferrari 312 PB, Chassis No. 0886 (the "**312 PB**"); Alfa Romeo 2500 SS256, Chassis No.: 915026 (the "**Alfa Romeo**"); (iii) ISO/A3C, Chassis No.: B0204 (the "**ISO/A3C**"); (iv) Williams F1 W14 (the "**Williams**"); and (v) 1972 Matra 670, Chassis No.: 02 (the "**Matra**") (collectively, with all their parts, accessories, and documentation that are owned by or in the possession or control of the Borrower or the Borrower's current lender, or which later come into the Borrower's ownership, possession or control, "**Collateral**")."

14. Attachment A to the FSA is a Continuing Power of Attorney/Power of Agency ("Continuing Power of Attorney"), by which Respondent Guikas appointed RM Financial Services LLC with specified powers concerning the previously described Collateral. Attachment B to the FSA is Respondent Guikas' Personal Guarantee ("Guarantee") among RM Financial Services LLC, Jean Guikas, and GTC SASU.

4

The Guarantee states: "**WHEREAS** the Guarantor is providing a personal guarantee for the obligations of the Customer as outlined in the Financing and Security Agreement ("**Financing Agreement**") with RMFS in accordance with the terms and conditions of this Guarantee."

15. Other provisions of these uncontested agreements and their application to the parties' current dispute are described and discussed below.

**The Financing and Security Agreement Arbitration Provision**

16. Claimants' arbitration is brought under their Financing and Security Agreement with Respondents dated as of December 15, 2021 ("Financing Agreement" or "FSA"). Section 9.16 of the Financing and Security Agreement Conditions of Business provides:

"This Agreement shall be interpreted in accordance with the laws of the State of Michigan, U.S., without regard to choice of law principles. Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement shall exclusively be subject to arbitration, and shall first be subject to mediation as a condition precedent to arbitration. If mediation is unsuccessful, the parties shall proceed to arbitration near Detroit, Michigan, before one arbitrator and all proceedings shall be conducted in English. The mediation and arbitration shall be administered by the American Arbitration Association pursuant to the AAA Commercial Arbitration Rules and mediation Procedures." Respondent Jean Guikas' accompanying Personal Guarantee dated as of December 14, 2021 (Guarantee), prescribes in its Section 5.11 the same arbitration terms with respect to the Guarantee.

17. As stated in R-2 of the applicable AAA Commercial Arbitration Rules, as Amended and Effective September 1, 2022 ("Commercial Arbitration Rules"): "When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these rules shall only be administered by the AAA or by an individual or organization authorized the AAA to do so."

18. AAA delegated this case for administration to its ICDR division. As the international division of the AAA, the ICDR provides dispute resolution services around the world in locations chosen by the parties (www.adr.org).

**Pre-Merits Hearing Proceedings**

19. Extensive interactions among the parties' counsel and Tribunal transpired between August 2023 and January 2024. At a succession of Zoom conference calls, counsel for the parties offered their views on multiple procedural, scheduling, and evidentiary issues. After each of these Zooms, the Tribunal entered a Procedural Order. The Procedural Orders contemporaneously recount who attended and what was discussed and decided at each of these sessions or in response to intervening emails from counsel. See the Tribunal's Procedural Orders: No. 1 (Aug. 14, 2023); No. 2 (Aug. 31, 2023); No. 3 (Sept. 7, 2023); No. 4 (Sept. 23, 2023); No. 5 (Sept. 28, 2023); No. 6 (Oct. 5, 2023); No. 7 (Oct. 16, 2023); No. 8 (Oct. 31, 2023); No. 9 (Nov. 2, 2023); No. 10 (Nov. 17, 2023); No. 11 (Dec. 8, 2023); No. 12 (Jan. 3, 2024); No. 13 (Jan. 8, 2024).

20. As the foregoing Procedural Orders memorialize, at every point from the outset of this arbitration through its conclusion, all parties have been represented by counsel and have been heard on

5

any topic they deem pertinent to the arbitration and resolution of their commercial dispute. Deadlines have been extended. Supplemental filings have been allowed. The Tribunal has encouraged full participation by both Claimants and Respondents. Charged with the responsibility to decide the parties' breach of contract dispute fairly and impartially, the Tribunal's objective has been to receive and evaluate their arguments, authorities, and evidence as comprehensively and diligently as the parties' cooperation made possible.

21. During 2023 the parties also participated in a concurrent AAA/ICDR mediation conducted by attorney John Lowe of Paris and New York (https://lowearbitration.com/about-mr-lowe/). Pre-mediation conferences were conducted in July and August 2023. The mediation concluded in early October 2023.

**Respondents' Procedural Objections**

22. Respondents GTC SASU and Jean Guikas signed, initialed, and agreed to resolve any disputes arising out of the Financing Agreement through mediation and arbitration as they prescribed in their contracts. When in late 2022 Mr. Guikas and his company were unable or unwilling to repay their debt to Claimants as the Financing Agreement dictated, Claimants filed this arbitration and later sold at auction some of the collateral for Respondents' delinquent loan. From that time and perhaps earlier, Respondents resisted Claimants' insistence on following the terms of the parties' contracts. Respondent GTC SASU opened a receivership proceeding in France after the start of this arbitration and have engaged in other adversarial court proceedings with Claimants in France, none so far determined in Respondents' favor. These French actions and other procedural objections have been the cornerstone of Respondents' ongoing attempt to avoid a hearing on their alleged breach though given every opportunity to contest their liability or the amount of that liability.

23. After multiple rounds of pleadings, briefs, and oral arguments, the Tribunal entered its Order on Respondents' Procedural Objections (October 30, 2023). Respondents' counsel continued to complain about the Order thereafter, repeating positions already considered and found incorrect or unpersuasive. See Procedural Order No. 8 (Oct. 31, 2023), and Procedural Order No. 9 (Nov. 2, 2023). Respondents offered no additional ground warranting reconsideration of the denial of Respondents' jurisdictional and procedural objections. In fact, their counsel, Ms. Favarel, when urged on the November 2 Zoom to present any new argument or contrary evidence, said she had nothing more to say and—without asking to be excused—left the conference.

24. By late December 2023 when exhibits and witness statements and pre-hearing materials were due, and even more so by early January 2024 before the Merits Hearing commenced, Respondents' procedural objections were substantially mooted by the passage of time and absence of imminent overlapping proceedings in France. On the contrary, the Merits Hearing with technological and time zone accommodations to Respondents provided the open forum agreed upon for presentation of their evidence and arguments, as well as an occasion to question Claimants' witnesses and contest their evidence on alleged breach of contract liability and damages. As described below, Respondents did not avail themselves of this opportunity.

**Preparation and Arrangements for the Merits Hearing**

25. As directed by Procedural Order No. 10 (Nov. 17, 2023) and Procedural Order No. 11 (Dec. 8, 2023), the parties exchanged and filed all witness statements expected to be offered at the Merits Hearing, along with memoranda on any factual or legal issues they believed would facilitate the Merits Hearing or make it more efficient or informed. On the December 15, 2024 due date Claimants submitted a Pre-Hearing Memorandum of Law, witness statements of Jarrett Rothmeier, Augustin Sabatie-Garat, and Byron Madsen, and a compendium of exhibits (CE 1-32) and authorities. Respondents did not submit

any legal memoranda, or witness statements. They did by December 15 email submit two exhibits, a pro forma bill of sale for the Ferrari 0886 and a classic car marketing flyer.

26. At the subsequently conducted January 3, 2024 Zoom conference, Respondents announced that attorney Christopher Kende of Hill, Betts & Nash LLP in New York would attend the Merits Hearing on behalf of Respondents and both the Receiver and Administrator in the French Receivership. Over Claimants' objection to the late notice (just hours before the Zoom conference), the Tribunal admitted Mr. Kende as additional counsel. The Tribunal stressed "that it was in the interest of all parties to have both sides actively represented by capable counsel. From his bio Mr. Kende has a long history with top law firms and notable success in contested cross-border commercial disputes. Among other strengths useful in this matter Mr. Kende's law firm profile states he is fluent in French." (https://www.hillbetts.com/christopherbkende.) The Tribunal inquired at the January 3 Zoom about testimony from Respondent Guikas whose participation in matters at issue in the arbitration seemed highly probative. Shortly after the close of the status conference, Claimants filed a Supplemental Witness Designation stating "their intention to call respondent Jean Guikas, individually and as principal/corporate representative of Respondent GTC, as an adverse witness at the Arbitration Hearing on the merits." Mr. Magyar affirmed during the conference that Claimants would not assert Respondents waived their procedural objections by producing Mr. Guikas as a witness. As a further accommodation to Respondents, the Tribunal ordered more generally: "Respondents' procedural objections have been briefed, considered and ruled on. They are nonetheless preserved for such post-arbitration proceedings as may occur." Procedural Order No. 12 (Jan. 3, 2024).

27. With respect to testimony from Respondent Guikas, the Tribunal ordered: "Claimants designated respondent Jean Guikas an adverse witness on January 3, 2024. Mr. Guikas may testify by video, as allowed by R-33(c) of the Commercial Arbitration Rules. Because Mr. Guikas is a party as well as a witness whose testimony seems like to elucidate the transactions at issue in the arbitration, he may be taken out of order for the purpose of facilitating his full participation from the French time zone—for example, morning in Detroit/afternoon in France. If he does not testify, his absence may warrant evidentiary presumptions under Michigan and other potentially applicable law." Procedural Order No. 13 (Jan. 8, 2004).

### Hearing on the Merits (January 2024)

28. The long-awaited Merits Hearing was held in Detroit, Michigan, as prescribed in the parties' FSA and Guarantee contracts. Commencing January 16, 2024, it was attended in-person by Claimants' attorneys Mark Magyar and Ashley Fickel. Claimants' witnesses Jarrett Rothmeier and Bryon Madsen also attended in-person. Claimants' witness Augustin Sabatie-Garat attended remotely from London. New York attorney Christopher Kende represented Respondents and by powers of attorney the French Receivership Receiver Vincent de Carrier and Administrator Frederic Avazeri. At Respondents' request, Mr. Kende attended remotely from New York. The Tribunal attended remotely from his office in Chicago, Illinois. The proceedings were videotaped by an on-site videographer and transcribed by a certified court reporter. Both the video and the transcript were circulated to counsel for the parties, the Tribunal, and the ICDR case administrator shortly thereafter.

29. Each side delivered its opening statement: Mr. Magyar for Claimants with a PowerPoint (slides sent to opposing counsel and the Tribunal) (Tr. 10-24), followed by Mr. Kende for Respondents (Tr. 24-33). After Mr. Kende concluded his opening statement, he announced he was not authorized by Respondents to participate further. Mr. Kende then disconnected from the hearing, despite the Tribunal's urging that he continue his participation. (Tr. 6-10, 33-40; Ex. CE-33.) At all times during the Merits Hearing, Mr. Kende, Respondents' several French counsel at Favarel & Associés, and Respondent Jean Guikas could have joined or rejoined the hearing. They elected to stay away.

7

30. The commercial dispute involves a substantial amount of money. It is a contest between two large and sophisticated traders in classic racing cars. Claimants and Respondents have engaged in auctions and purchases and sales of classic cars for nearly 20 years. Despite the complications of the French Receivership and related French civil actions, the parties' contractual arbitration provision is clear and requires no interpretation. Equally clear are the parties' FSA and Guarantee contracts' history, purpose, and their provisions on repayment, consignment and resale of collateral, and termination events, including defaults, missed interest payment, prejudice to the collateral caused by Respondents, and any false statement by Respondents, or initiation of GTC receivership proceedings. Few of the facts are disputed. None are convincingly contested.

31. Under the FSA, Claimants provided Respondents with financing in the principal amount of 23.4 million euros. (Claimants' Ex. 9, FSA.) As stated in the FSA, the purpose of the financing was to "address a number of transactions that have occurred since March 2021 between the Parties" and to "consolidate the transactions into one Agreement moving forward [the FSA]." These prior transactions included a March 2021 Advance Addendum to the parties' Auction Consignment Agreement (Claimants' Ex. 3), and an August 2021 Second Advance Addendum (Claimants' Ex. 5).

32. Under Section 3.2 of the FSA, "Repayment" of the loan consisted of selling a Ferrari 312PB as collateral and, if that sale did not entirely satisfy the loan, Respondents agreed to "consign and sell remaining Collateral" until there was full repayment. Sections 5.3 and 6.1 through 6.3 likewise set forth agreed upon terms for the sale of Collateral or cash payments to make the full Repayment. If the sale of the Ferrari 312PB did not yield proceeds sufficient to satisfy the loan, Respondents could pay the balance either in cash or sell other items of Collateral itemized in Sections 6.1.1, 6.1.2, and 6.1.3 of the FSA. If selling all the Collateral was still insufficient to satisfy the loan, the result under Section 6.3 was a "Termination Event," triggering clause 4 of the FSA Conditions of Business. The circumstances each independently constituting a Termination Event are set forth in Section 4.1 of the FSA Conditions of Business: "RMFS may take any and or all of the actions outlined in clause 4.2 of this Agreement immediately if any of the following events occurs [listing events 4.1.1 through 4.1.17]." These Termination Events include that the Repayment remained outstanding at the due date without an extension, a default, a missed interest payment, prejudice to the Collateral caused by Respondents, any false information supplied by Respondents to RMFS, receivership proceedings over any of GTC's assets, any breach of the FSA by Respondents, and the occurrence of any event "which, in RMFS' opinion, has or is likely to have a material adverse effect on the Borrower's business, properties or condition, financial or otherwise or on the Borrower's ability to duly perform and observe its obligations under this Agreement." The listing is comprehensive and uncontested by Respondents.

33. The December 20, 2022 Repayment date came and passed without Respondents fulfilling their contractual obligations. This was a Termination Event resulting in a "Deficiency" under the FSA (Conditions of Business, Sec. 4.4). Claimants made a lawful demand for repayment on December 26, 2022. (Claimants' Ex. 13.). During December 2022 through February 2023, Claimants repeatedly reminded Respondents of Claimants' contractual right and intention to sell the Ferrari 312PB. (See, for example, Claimants' Exs. 13, 15, 16, 18.) Moreover, as a result of the multiple Termination Events that occurred, Section 4.2 of the FSA's Conditions of Business gave Claimants the "unilateral right to sell the Collateral either by auction or private sale . . . ." (Claimants' Ex. 9, Conditions of Business Sec. 4.2.4.)

34. Claimants filed this arbitration on March 24, 2023, at a time when Respondents owed more than 25 million euros under the FSA. Claimants sold the Ferrari 312PB at public auction on May 20, 2023, and accordingly credited Respondents' account by the 10.7 million euro net proceeds received. As of the date of the Merits Hearing, Respondents' account had an unpaid balance scheduled at nearly 17.8 million euros (Claimants' updated Ex. 30), with fees, interest and expenses continuing to accrue thereafter.

8

Respondents have not challenged any of Claimants' damage computations. They offer no quantum calculations of their own.

35. At the January Merits Hearing, by exhibits and the credible witness testimony of Jarrett Rothmeier, Augustin Sabatie-Garat, and Bryon Madsen, Claimants proved every element of their breach of contract claim: (1) the existence, validity, and applicable provisions of the FSA between the parties; (2) Respondents' breaches of the FSA; and (3) damages to Claimants caused by Respondents' breaches. (The breach of contract elements are familiar across jurisdictions and uncontested by Respondents. For their statement of these elements under Michigan law, see *Miller-Davis Co. v. Ahrens Construc., Inc.*, 495 Mich. 161, 178 (2014).) Claimants also proved that they properly sold the Ferrari 312PB Collateral, reducing the unpaid debt by the net proceeds of the sale. The FSA entitled Claimants to sell the Collateral to satisfy a portion of Respondents' unpaid debt/Deficiency, and they did so in a commercially reasonable manner under Michigan law.

36. Claimants' first witness at the Merits Hearing was RM Auction Vice President for Private Sales Jarrett Rothmeier. Mr. Rothmeier is an expert on classic cars, especially Ferraris. He maintains a personal database on the provenance of virtually every individual Ferrari chassis number. (Tr. 44.) As RM CFO he had been involved in auction advance agreements with Jean Guikas over a number of years. He engaged personally with Mr. Guikas beginning in 2020 when Mr. Guikas invited him to visit his sites in Marseille and Carnoux-en-Provence. (Tr. 44-45.) Mr. Guikas was selling GTC's Marseille building and wanted to downsize the overall collection by about half through a large auction. Working with his colleague Mr. Sabatie-Garat, Mr. Rothmeier reached agreement with Mr. Guikas for an RM conducted auction of about 70 GTC cars that took place in November 2021 at Le Castellet Paul Ricard racetrack near Marseille. Mr. Rothmeier described the Claimants' pertinent 2021-23 transactions with Respondents. He testified to the history of Respondents' "advance on sale" structure of transactions with Claimants. (Tr. 46-48.) Mr. Rothmeier was directly involved in and related the business background of the parties' Auction Consignment Agreement of March 2021, the first Addendum of March 2021, and the Second Addendum of August 2021. (Exs. CE-2, 3, and 5; Tr. 44-46, 48-62.) These transactions resulted in financing by Claimants to Respondents of 47.6 million euros. (Tr. 62.) Mr. Rothmeier testified about the November 2021 auction, its 39,532,700-euro result, and the roughly 18 million Euro shortfall remaining due by Respondents after the auction. (R. 63-64.) He explained that he is the person Respondents contacted after the November 2021 auction to negotiate a new deal, which culminated in the December 15, 2021 Finance and Security Agreement (FSA) at issue in this arbitration. (Ex. CE-9; Tr. 64-73.) Mr. Rothmeier executed each of these underlying agreements, including the FSA, as did Respondent Jean Guikas, on behalf of himself personally and on behalf of his company, GTC. (Tr. 86, 103.)

37. Mr. Rothmeier testified credibly about the negotiation of the FSA (Tr. 64-72), the collateral to be supplied for the FSA (Tr. 70-73), and each material term of the FSA that applies to the issues in this case (Tr. 73-103). His testimony showed that the parties validly entered the FSA (Tr. 73, 86, 103), that Respondents made only the first two interest payments under the FSA, defaulting after not paying off the loan by the December 2022 Repayment date set forth in the FSA (Tr. 87-88), and that Respondents committed other breaches of the FSA, including initiating receivership proceedings in France, missing and not curing interest payments due, and prejudicing and putting at risk Claimants' interest in the Collateral (Tr. 88-91). Mr. Rothmeier also detailed Claimants' rights under the FSA upon a default, including to sell Collateral—noting, however, that Respondents turned over only one of collateral vehicles, the Ferrari 312PB Claimants sold in May 2023. (Tr. 92-100.)

38. With respect to the sale of the Ferrari 312PB Collateral, Mr. Rothmeier explained that Mr. Guikas had made efforts in 2022 to sell the vehicle. His efforts and RM's efforts to sell the Ferrari 312PB privately at a very high price were unsuccessful. Ultimately, after a concerted marketing campaign, Claimants were able to auction the vehicle at Villa d'Este in Italy. (Tr. 96-100, Ex. CE-26.) Respondents'

Statement on Objections to Admissibility and Defence on the Merits criticizes RM's efforts to sell the Ferrari 312PB. These pleading-contentions are unsupported by any evidence and are contrary to the record. (Respondents' Statement, pars. 85-89, Oct. 12, 2023.)

39. Mr. Rothmeier also refuted the sole exhibit and argument Respondents offered to claim they had fully repaid their debt to Claimants. Respondents argued in each edition of their Statement on Objections to Admissibility and Defence on the Merits that: "In accordance with the terms of the FSA, a trade invoice was issued by RM on January 7th, 2022 [FN 8 'Ex. R-8 . . . acknowledging payment of G.T.C's debt by the exchange of two RM vehicles against G.T.C's Ferrari 312 PB 0886']. At this date, G.T.C. and Mr GUIKAS had fulfilled any financial obligation toward the RM Companies pursuant to the FSA." (Defence, pars. 17-22, 83-84, Oct. 12, 2023.) In fact, as Mr. Rothmeier explained, the "trade invoice" was a proforma, incomplete, unsigned bill of sale. It did not change ownership but was requested by Mr. Guikas to facilitate the swapping of collateral at a time at which Respondents owed Claimants more than 23 million euros (Ex. CE-10; Tr. 78-84; and FSA Conditions of Business Sec. 9.18 providing "This Agreement may not be amended or modified in any respect except by written instrument signed by both Parties".) Mr. Rothmeier's testimony on this point (as well as those summarized above) was believable, consistent with the written record, and unrebutted by Respondents.

40. Claimants' second witness at the Merits Hearing was RMFS Director of Sales Agustin Sabatie-Garat. Mr. Sabatie-Garat said he had known Mr. Guikas and his company GTC for more than 20 years. Mr. Guikas has been "a very active actor of the car, classic car, I would say, industry in general, whether it's . . . buying, selling, and especially race vehicles. . . . so he's been one of those person[s] you would see at most of the European events by them as someone like fairly known in the business." (Tr. 106-107.) Mr. Sabatie-Garat testified that Mr. Guikas was familiar with conducting business on an advance-on-sales basis. He said Mr. Guikas had purchased about 44 cars with RM, along with consignments and sales of 13 cars through RM. (Tr. 107-108.) Mr. Sabatie-Garat helped research, catalog, and market the November 2021 Le Castellet auction. (Tr. 108-118.). Mr. Sabatie-Garat was also involved in the attempted private sale of the Ferrari PB312 Collateral by both Mr. Guikas and RM at what Mr. Sabatie-Garat said was a very high price in 2022. (Tr. 121-126; Ex. CE-12.)

41. Bryon Madsen, RMFS President and Chief Strategy Officer, was Claimants' third witness. Claimants' FSA loan to Respondents was, he said, the largest outstanding at the time of Respondents' default. He testified as to notices given, and travel to Marseille in January 2023 to and subsequent meetings with lawyers to attempt to negotiate a repayment resolution. (Tr. 143.) Mr. Madsen testified to Claimants' Statement of Account (CE-30, updated from initial Statement of Account submitted December 15, 2023). The total owed as recorded in the Statement of Account dated January 16, 2024, was 17,788,823.38 euros. Mr. Madsen explained the Statement's calculations, including Respondents' starting debt, credit for two interest payments, credit for the net sale price for the Ferrari Collateral, interest, and penalties under FSA Conditions of Business Sections 4.2, 4.2.2, 4.3, and 4.5. (Tr. 165-184.) At no time since the January Merits Hearing or since the February 9, 2024 post-hearing submission date have Respondents disputed any aspect of Mr. Madsen's testimony or Claimants' computation of its breach of contract damages.

42. Claimants' Post-Hearing Memorandum further explains and defends the enforceability of the FSA interest provisions under Michigan law. (Post-Hearing Memorandum, pp. 18-22, Feb. 9, 2024.) Claimants' explanation is factually and legally sound. It is unanswered by Respondents.

43. Mr. Madsen also testified convincingly that the May 2023 sale of Respondents' Ferrari 312PB collateral—Claimants' "unilateral" right under the FSA—was conducted on a commercially reasonable basis under Michigan law standards. The auction in Italy at which Claimants sold the collateral was an appropriately typical and commonplace market and manner for such a sale, was commercially reasonable beyond doubt, and was conducted after ample marketing efforts and ample notice to Respondents (which

10

was not even required because the FSA provides for sale of the collateral without notice after a default. (Tr. 154-164.) In *Estate of Stoddard*, because the collateral at issue (stock) is "typically traded on a recognized market," the "sale of the collateral on *that* market [wa]s deemed to be commercially reasonable" as a matter of law under the Michigan Uniform Commercial Code, MCL 440.9507(2) (emphasis added). Likewise, as Mr. Madsen explained, classic Ferraris are typically sold at auctions exactly like the one held by Claimants in Italy and the FSA expressly provides for selling the collateral at an auction. (FSA Conditions of Business Sec. 4.2.4.)

44. Additionally, in *Estate of Stoddard*, "the contract itself put [debtors] on notice that the collateral could be sold without giving [debtors] notice of the sale." 1996 Mich. App. LEXIS 639, at *5. The debtors "were highly experienced in such financial matters," so "there [wa]s no unjust result." *Id.* Here, Mr. Madsen noted, it was not until April 22, 2023, that Mr. Guikas finally turned over the legal documentation, including title work, for the Ferrari 312PB as necessary for Claimants to conduct a sale. (Tr. 153-156.) By then, Claimants had repeatedly provided Respondents with written notice through their lawyers from December 2022-February 2023 of their intention to sell the collateral as soon as they could and demanded the documentation needed for the sale. (Tr. 143, 149-156; Claimants' Exs. 13, 16, 18, 25.) Claimants were then finally able to complete the sale of the Ferrari 312PB at their public auction at Villa Erba, Italy, on May 20, 2023, having received the vehicle's documentation from Mr. Guikas less than one month earlier. (Tr. 154-156; Claimants' Ex. 25.)

45. Not only are classic cars like the Ferrari 312PB typically traded at public auction for purposes of the Michigan UCC, but the FSA expressly provides that, due to Respondents' default, Claimants had the "unilateral right to sell the Collateral either by auction or private sale . . . ." (Claimants' Ex. 9, FSA Conditions of Business, Sec. 4.2.4.) As affirmed by Mr. Madsen, Claimants' sale of the Ferrari 312PB at a public auction after Respondents' multiple unsuccessful prior attempts to sell it themselves at an above-market price was commercially reasonable as a matter of law. Despite the pleading-contentions in their Statement on Objections to Admissibility and Defence on the Merits (pars. 90-93, 97, Oct. 12, 2023), Respondents offered no evidence to rebut Mr. Madsen's testimony. Also unrebutted by Respondents are the corroborating arguments and supporting Michigan judicial decisions and statutory references collected in Claimants' Post-Hearing Memorandum (pp. 8-10, Feb. 9, 2024).

46. Respondents' French and U.S. lawyers failed and refused to participate in the Merits Hearing except for an opening statement, nor did they otherwise cross-examine Claimants' witnesses, challenge Claimants' exhibits, or present a defense or any evidence supporting Respondents' case or prayer for relief on the merits. (Respondents' Statement, par. 97, Oct. 12, 2023.) Respondents' prayer for relief on the merits is unsupported by the facts and law. See Pars. 5-6 above and Par. 65 below.

**Adverse Inference Against Respondents**

47. Based on the agreed-on terms of the FSA, the credible testimony and evidence received at the Merits Hearing, and the parties' memoranda and legal authorities submitted before and after the Merits Hearing, Claimants have proven that Respondents breached the FSA damaging Claimants in the ascertainable amount scheduled in their Statement of Account (Claimants' Ex. 30). Though not necessary to reach this conclusion, Respondent Guikas' failure and refusal to testify at the January Merits Hearing—or offer any merits defense—in this civil commercial arbitration warrants the negative inference that the facts and law are contrary to the position Respondents have taken throughout the arbitration.

48. Immediately following the Merits Hearing, the Tribunal emailed all counsel (Jan. 16, 2024): "During this period [while the court reporter prepared the transcript and the record remained open for post-hearing briefs and supporting materials due Feb. 9] Respondents are again urged to offer exhibits they believe are relevant to the parties' dispute. Respondent Guikas and those advising him should

11

reconsider his reported unwillingness to testify either affirmatively on his own behalf or as an adverse witness called by Claimants. The exhibits and testimony received January 15 confirm beyond doubt that his role in the parties' dispute is central. He is also of course a party to the arbitration as well as the signatory for his company and a guarantor of the parties' contracts at issue. Every accommodation to receiving his testimony at a convenient time and by visio from France has been offered. At this point, Mr. Guikas and his counsel will have the further benefit of a video and transcript of Claimants' exhibits and testimony in which he is a critical actor and decision-making principal. He should avail himself of the opportunity to be heard and to set the record straight if the facts so warrant."

49. As recently as her February 14, 2024 email to the Tribunal and Claimants' counsel, Respondents' attorney Ms. Favarel asserted: "By choosing not to participate to the hearing, Mr GUIKAS has exercised his right to refuse to appear in proceedings that should have never begun, given the various objections to jurisdiction and admissibility raised since the beginning of this arbitration in July 2023. He was under no obligation to do so." She is mistaken. Jean Guikas is a Respondent in this arbitration. He owns the business Respondent. He has been the principal actor and principal decision-maker for Respondents on all the transactions at issue in this arbitration. Respondents have appeared by French and U.S. counsel in this arbitration. Respondents have neither defaulted nor withdrawn, nor have they objected to the Merits Hearing proceeding in their absence as is expressly permitted under R-32 of the Commercial Arbitration Rules. They pray for an award in their favor on the merits. When Respondents stated in early January 2024 they did not intend to call Mr. Guikas as a witness at the Merits Hearing, Claimants properly designated him as an adverse witness they would call. (Claimants' Ex. 33.) Exercising his supposed "right to refuse to appear" to answer questions from counsel and the Tribunal has logical and legal consequences.

50. In civil cases, the Supreme Court of the United States has held that "[t]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.'" *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (citation omitted). Michigan state courts also permit an adverse inference from a party's failure to testify during a civil proceeding. *See In re Griffin*, 2016 Mich. App. LEXIS 1712, *7 (Mich. Ct. App. Sept. 15, 2016) ("However, the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refused to testify in response to probative evidence offered against them"); *see also Grossheim v. Associated Truck Lines, Inc.*, 181 Mich. App. 712, 715 (1989) ("Furthermore, under Michigan law, an adverse inference may be drawn against a party who fails to produce evidence within its control."). Many other U.S. and Michigan court decisions and approved jury instructions state the same proposition. The reason and its application to in this arbitration is clear. If Jean Guikas had a plausible ground to contest nonpayment of his debt or the amount of his debt, why would he refuse to give his account of the facts as he believed them? Especially, why would he refuse to answer questions about multi-million euro matters in which he was intimately involved when he could do so from France at a time convenient to him and his French and U.S. attorneys? As an additional basis for determining that Claimants are entitled to an award for damages resulting from Respondents' breach of the FSA, the logical inference from Respondent Guikas' refusal to testify is that nothing he could honestly say would contradict that conclusion.

51. Claimants ask in their Post-Hearing Memorandum that the Tribunal take this legally permissible, logical adverse inference further. Citing a number of facts and suppositions, Claimants suggest "Respondents must have been secretly planning to challenge the November 2021 auction as a basis to renege on their obligations under the FSA. . . . It is reasonable to infer, especially based upon Respondents' refusal to testify, that Respondents never intended to fully pay under the FSA, even when first entering into the agreement. Respondents got the benefit of the FSA, including the financing to obtain yet more Ferraris, but then disclaimed the agreement entirely based upon an auction they already knew about and were supposedly agreeing to repay the shortfall when requesting, negotiating and signing the FSA. . . . (Tr. 64.)" Claimants cite other facts that could plausibly lead to this conclusion. The concede,

12

however, that "[o]nly Mr. Guikas could have testified as to his motives and intentions when signing the FSA, his inducements of Claimants to enter the FSA, and whether the collateral he provided was already leveraged or whether he leveraged collateral under the FSA during the loan term, and where the collateral exists today and why he has not turned it over to Claimants." Unable to put these questions to Mr. Guikas, they propose a list of adverse inference against Respondents, pertaining not only to the breach of contract and damages discussed above, but also new claims of fraudulent inducement, fraudulent misrepresentation, and wire fraud. They ask that the pleadings be conformed to the evidence to "find that Respondents committed multiple species of fraud." (Post-Hearing Memorandum, pp. 13-15, Feb. 9, 2024.)

52. Respondents do not answer these accusations. Had Mr. Guikas testified he might have had explanations for his conduct or been able to correct or dispel the negative inferences Claimants suggest. Nonetheless, even were the Tribunal to allow the addition of fraud claims after the Merits Hearing based on inference-augmented charges, other due process considerations would have to be satisfied potentially protracting the arbitration and jeopardizing an otherwise plainly supported Award—offering little benefit to Claimants, even if deserved. The damages recoverable would not be increased leaving the end monetary result unchanged. For this reason, and without any ruling on the substance of any of Claimants' post-Merits Hearing fraud claims, their pleadings will not be amended to conform to the evidence of fraud suggested by Respondents' conduct and particularly by Mr. Guikas' refusal to answer questions from Complaints' counsel and the Tribunal. Future fraud charges by Claimants against Respondents are not precluded by this Award. They are preserved and saved for another day in another forum. See Par. 66.

**Claimants' Damages Caused by Respondents' Breach of Contract**

53. Claimants' damages, including interest and penalties as prescribed in the FAS are scheduled in their Statement of Account (Claimants' Ex. 30). As previously noted, Respondents do not challenge any of these computations or their contractual basis. The Tribunal finds them warranted by the evidence received during the arbitration and at the January Merits Hearing. The damages as stated by Claimants are correctly calculated and validly claimed.

**Prevailing Party Fees and Costs**

54. Claimants have prevailed in this arbitration. Their Demand for Arbitration and Statement of Claim seek attorneys' fees, interest, arbitration costs, as provided in the FAS Conditions of Business Sec. 9.16 and 4.5 and Personal Guarantee Conditions of Business Sec. 5.11. Such fees, interest and arbitration costs are permitted, as well, under R-49(c) and (d) of the Commercial Arbitration Rules. Respondents were not prevailing parties. They also recognize, however, the propriety of "costs following the event" in arbitral proceedings. Their pleading Objections and Defence prays that Claimants "bear all arbitration and mediation costs, as well as reasonable attorney fees and costs incurred by the Respondents" (Defence par. 97, Oct. 12, 2023).

55. As prospectively prevailing parties (no decision had yet been reached), Claimants submitted Claimants' Bill of Costs for this Arbitration on the post-Hearing filing due date, February 9, 2024. The Bill of Costs seeks 376,321.10 euros of attorneys' fees, costs, and expenses through January 2024. Claimants' validated and quantified costs are: (1) fees for U.S. attorneys at Dykema law firm (https://www.dykema.com), Ashley Fickel, Mark Magyar, Susan Feibus, Andrew Hussey, and paralegal Theresa Dick for hourly charges at reasonable, survey-supported market rates ($166,179.87, Exs. 2 and 7); (2) related costs and disbursements, primarily consisting of copy charges, courier charges, court reporting/videographer fees, and travel to/from the Merits Hearing, as detailed in invoices supplied; (3) arbitration fees, compensation and expenses billed by AAA/ICDR and the Tribunal and paid by Claimants ($148,333.79, Ex. 1); (4) fees for work required by this arbitration undertaken by French attorneys at Taylor Wessing law firm (https://www.taylorwessing.com/en/contact-us/paris), Gilles Amsallem, Laure

Hue de la Colombe, Kristell Cattani, Antoine Simonneau, Marie Chereau, Ines Slougui for hours and at rates that seem reasonable (83,823.40 euros, Ex. 9); plus (5) Taylor Wessing's associated costs and disbursements, primarily consisting of translation costs and travel costs as detailed in invoices supplied. None of these requested costs have been challenged or questioned by Respondents, though they were expressly given until February 23, 2024 to do so. The Tribunal has reviewed Claimants' Bill of Costs and finds these costs to be appropriate to the case, reasonable in amount, and supported by extensive documentation, including billing records, declarations of attorneys providing services (Exs. 3-6, 8), and Michigan court decisions on award of attorneys' fees (Ex. 10).

56. Claimants' Bill of Costs filed February 9, 2024, notes that fees for February 2024, including post-hearing submissions have not been billed. They ask to be allowed to submit an updated, post-award for additional fees and costs incurred in this matter. There are also post-January ICDR/Tribunal charges. Additionally, damage interest and penalties also continue to accrue past the date of Claimants' Statement of Account (Ex. 30, January 15, 2024). To expedite the conclusion of this arbitration, the Tribunal notified all counsel by email on February 26, 2024: "Claimants may supplement and update their Bill of Costs with attorneys' fees and expenses, including case administration and arbitrator fees paid to the ICDR, incurred after those reported in their attached February 9, 2024 submission. Claimants may also supplement and update their Statement of Account admitted at the January 16, 2024 Merits Hearing. Claimants' supplements and updates are due March 8, 2024. Respondents shall have until March 15, 2024, to submit their responses."

57. Claimants submitted the supplements and updates invited on March 7, 2024, followed by a short email later that day on ICDR/Tribunal charges. The updated Statement of Account has a March 8, 2024 balance owed of 18,256,466.89 euros. Additional U.S. attorneys' fees, costs, and disbursements total $20,786.44 (19,008.49 euros), plus 2,063 euros ($2,248.67) for French counsel. The final ICDR and Tribunal costs are as stated in the Award below. Upon review, they are acceptable in form and amount. Added to those requested in the Feb. 9 Bill of Costs—separating out the ICDR/Tribunal charges—reimbursable prevailing party fees and expenses total $186,966.31 (x .92 = 172,009.01 euros), plus 85,886.40 euros (83,823.40 + 2,063); 172,009.01 + 85,886.40 = 257,895.41 euros. Respondents failed to challenge Claimants' supplements and updates and have waived any subsequent contest of their form or amount.

### Scope of the Award

58. R-49(a) of the Commercial Arbitration Rules provides: "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." Following the January Merits Hearing, the parties exchanged emails debating the form and scope of any awards against the respective Respondents. (Emails dated February 12, 14, 21, 2024.) Based on the authorities and rationales cited, the Tribunal accepts the positions on relief sought by Claimants as elaborated in the Award below in their favor, with differences provided as to the two Respondents.

59. The Award pertaining to Respondent GTC SASU validates and quantifies Claimants' damages. It is not an order for Respondents to pay money to Claimants. It is like a declaratory judgment as contemplated under Michigan law. See Michigan Court Rule 2.605. Claimants represent they will submit the award as proof of their claim in the French insolvency. The Award pertaining to Respondent Jean Guikas differs. As Claimants argue, "the existence of the receivership proceedings *does not* prevent the Arbitrator (or any judge) from ordering the guarantor to pay the due amount, which is different from GTC, as the entity in receivership. The existence of the receivership proceedings *merely prevents* Claimant RMFS, if it obtains an award, to enforce the award against the guarantor *during the time of the receivership proceedings* or, if [ ] a reorganization plan is adopted, during the time the plan is complied with by the

14

debtor. Should a reorganization plan be adopted but not be complied with by GTC, or should a liquidate of GTC be ordered, the right to enforcement of the award against GUIKAS would be triggered." (Magyar email sent to all counsel, Tribunal and ICDR, Feb. 21, 2024.)

## AWARD

For the reasons stated above, I award as follows:

60. Claimants RM Auctions, Inc. and RMS Financial Services LLC have proven their claim against Respondents GTC SASU and Jean Guikas for breach of contract and resulting damages. As of March 8, 2024, the amount of Claimants' damages is 18,256,466.89 euros as validated and quantified in this arbitration and described above.

61. Additionally, as prevailing parties, Claimants are awarded their incurred attorneys' fees, expenses, and disbursements in the amount of 257,895.41 euros. This award is not an order for Respondents to pay money to Claimants. It declares, validates, and quantifies Claimants' damages and prevailing party reimbursable costs.

62. The administrative fees of the ICDR totalling $31,218.79 and the compensation and expenses of the arbitrator totalling $140,222.20 shall also be borne by Respondents. Therefore, Respondents owe reimbursement to Claimants in the amount of $171,440.99, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimants. These costs, all of which have been paid by Claimants, are now owed by Respondents to Claimants in addition to the fees and expenses stated above.

63. As to Respondent GTC SASU, this award declares, validates, and quantifies damages and related costs resulting from its breach of the FAS contract. The award as to GTC is not intended as an order for Respondents to pay money to Claimants. Claimants may use it as proof of their claim in the GTC SASU insolvency. The Tribunal respects the role and responsibility of the French receiver and administrator and hopes the decision and the fact-gathering and evidence on which it is based will be helpful to them in undertaking their duties under French law and on behalf of all GTC creditors.

64. As to Respondent Jean Guikas, the Tribunal affirms that Mr. Guikas is a guarantor of his company, GTC SASU's FAS debt to RMFS in the amount of its breach of contract damages to RMFS and related attorney's fees and costs, including ICDR/Tribunal charges. He is ordered to pay the amounts owed if and when a reorganization plan is adopted in the insolvency that is not afterwards complied with, or if a liquidation is ordered in the insolvency.

65. All relief prayed for by Respondents in this arbitration is denied. This expressly includes without limitation any relief pertaining to the November 2021 Auction at Circuit Paul Ricard in Le Castellet, France, the unsigned January 2023 trade invoice, and Claimants' May 2023 auction sale of the Ferrari 312PB collateral at Villa Erba, Italy.

66. This award fully resolves all claims submitted in this Arbitration. All other claims and requests in this arbitration not specifically addressed above are denied.

* * *

I hereby certify that, for purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Arbitration Award was made in Detroit, Michigan, USA.

Dated: April 12, 2024

ENTERED:

Peter V. Baugher, Arbitrator

Baugher Dispute Resolution LLC
130 North Garland Court – Suite 4101
Chicago, Illinois 60602
+1 847-912-1716
pbaugher@baugherlegal.com
www.baugherlegal.com